**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARY LEE PICKETT,

        Plaintiff,

vs.                                         CASE NO. 3:06-cv-190-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

### ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for a period of disability and supplemental security income payments ("SSI"). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations. Accordingly, the matter has been decided on the written record. The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. For the reasons set out herein, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

On August 3, 1998, Plaintiff filed an application for SSI benefits (Tr. 83-84). Plaintiff's application was denied initially and upon reconsideration (Tr. 64-67). Pursuant to Plaintiff's request, an administrative hearing was conducted on March 31, 2000, in Gainesville, Florida, before Administrative Law Judge John D. Thompson (the "ALJ") (Tr. 33-63). In a decision dated May 19, 2000, the ALJ denied Plaintiff's claim by finding her able to perform past relevant work (Tr. 18-19). On November 2, 2000, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 5). Plaintiff then appealed under 42 U.S.C. Section 405(g).

On October 16, 2001, upon motion by the Commissioner, the U.S. District Court for the Middle District of Florida entered an order remanding the case under sentence four of 42 U.S.C. Section 405(g) (Tr. 294). The ALJ was instructed to reevaluate and further consider Plaintiff's alleged mental impairment with the medical records and opinion evidence and to reevaluate Plaintiff's Residual Functional Capacity ("RFC") accordingly (Tr. 293-95). On October 8, 2002, a second administrative hearing was conducted in Gainesville, Florida, before ALJ John D. Thompson (*see* Tr. 307). On October 23, 2003, a third administrative hearing was conducted in Gainesville, Florida, before ALJ John D. Thompson (Tr. 251-90).[1] In a decision dated August 24, 2004, the ALJ denied Plaintiff's claim by finding her able to perform past relevant work (Tr. 246).

---

[1] The record does not indicate why a third administrative hearing was held.

## II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).

The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits.  *See* 20 C.F.R. § 416.920(a)(4)(i-v);[2] *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner.  *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987).  The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  *See also  Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

---

[2]  Unless otherwise specified, all references to 20 C.F.R. will be to the 2008 edition.

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairment. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the

relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations.  20 C.F.R. § 416.912(c).

### III. Background Facts

Plaintiff was 59 years old at the time of the ALJ's decision with past relevant work experience as a certified nursing assistant (Tr. 245-46).

### A. Medical Evidence

From March 6, 1998 to March 21, 2000, David G. Fanney, D.O. ("Dr. Fanney"), was Plaintiff's treating physician (Tr. 165, 199).  On March 6, 1998, Plaintiff presented to Dr. Fanney and reported she visited an emergency room on March 1, 1998 due to bronchitis (Tr. 165).[3]  On March 30, 1998, x-rays taken of Plaintiff's chest showed "full expansion of both lungs" and "no free fluid" (Tr. 164).  On April 30, 1998, Dr. Fanney's notes revealed Plaintiff's bronchitis was improved and her lungs were clear (Tr. 159).  Dr. Fanney prescribed a Z-pak (an antibiotic) on this date in order to resolve Plaintiff's bronchitis (Tr. 159).  On March 29, 1999, Dr. Fanney prescribed Plaintiff Codiclear (a cough suppressant) and on April 8, 1999, Dr. Fanney found Plaintiff's bronchitis was resolved (Tr. 148).

On July 30, 1998, Dr. Fanney reported that Plaintiff had collateral tendinitis of the left knee (Tr. 155).  Dr. Fanney injected Plaintiff's knee with Dexamethasone (a steroid) mixed with Marcaine (an anesthetic) (Tr. 155).  On August 19, 1998, Plaintiff underwent a Rheumatoid Profile which was negative for all antibodies (Tr. 156).

On November 16, 1998, Plaintiff underwent a consultative examination by state agency medical consultant, Bienvenido M. Samera, M.D. ("Dr. Samera") (Tr. 119-21).  Dr.

---

[3]  It is unclear from the record whether Plaintiff's bronchitis developed prior to March of 1998.

Samera reported that Plaintiff had arthritis of the hand and knees but neither were severe in nature (Tr. 121).  Additionally, Dr. Samera reported Plaintiff did not exhibit wheezing or rhombic during the examination despite her reports of bronchitis (Tr. 121).

On January 29, 1999, Sandra L. Sanders, S.D.M.[4] ("Ms. Sanders"), from Disability Determination Services ("DDS"), completed an RFC assessment of Plaintiff (Tr. 130-37).  Ms. Sanders noted Plaintiff could lift 50 pounds occasionally, 25 pounds frequently and could stand for six hours in an eight hour workday (Tr. 131).  Ms. Sanders found Plaintiff's Range of Motion ("ROM") was normal throughout and Plaintiff reported no muscle weakness or numbness of the extremities (Tr. 131).  Additionally, Ms. Sanders found Plaintiff's arthritis of the hands and knees was not severe (Tr. 131).

On April 8, 1999, Dr. Fanney first noted Plaintiff's anxiety and prescribed Plaintiff Xanax (an anti-anxiety medication) (Tr. 148).  On May 4, 1999, Dr. Fanney reported Plaintiff experienced "tenderness in the L4-L5 region" and diagnosed Plaintiff with lumbar disc disease with arthritis (Tr. 146).  Dr. Fanney also diagnosed Plaintiff with anxiety and depression (Tr. 146).

On June 7, 1999, Dr. Fanney completed a Medical Assessment regarding Plaintiff's ability to work (Tr. 143-45).  Dr. Fanney reported that Plaintiff was unable to climb, stoop, crouch, balance, kneel, or crawl and, further maintained that Plaintiff could only stand or walk for three hours in an eight hour workday (Tr. 143-44).

Also on June 7, 1999, Plaintiff complained to Dr. Fanney that she experienced pain in both knees and Dr. Fanney prescribed Plaintiff Lortab (a narcotic pain medication) (Tr.

---

[4] The designation "S.D.M." refers to "single decision maker."  It appears from the record that Ms. Sanders is not a medical doctor.

6

207).  On July 7, 1999, Dr. Fanney reported Plaintiff was "doing well except for pain in her knees and legs" (Tr. 207).  On July 27, 1999, Dr. Fanney diagnosed Plaintiff with trocanteric bursitis of the hips (Tr. 207).[5]  On November 1, 1999, Dr. Fanney noted Plaintiff's chronic back pain was better and her bursitis was improved (Tr. 205).

On July 21, 1999, Plaintiff presented to state agency medical consultant, Andres Nazario, Jr., Ph.D. ("Dr. Nazario") for a General Clinical Evaluation with Mental Status (Tr. 133-41).  Dr. Nazario stated Plaintiff was oriented to person, place, and time and her memory appeared intact (Tr. 140).  Dr. Nazario reported Plaintiff appeared somewhat depressed but her impairment did not appear to preclude Plaintiff from employment (Tr. 140).  Based on Plaintiff's description of symptoms, Plaintiff's presentation, and her medical records, Dr. Nazario found Plaintiff suffered from Dysthymic Disorder (Tr. 140).[6]  Dr. Nazario recommended that Plaintiff seek mental health services and noted her prognosis for recovery was good if she complied (Tr. 140).

On February 14, 2000, Dr. Nazario filled out a Medical Source Statement and did not identify any specific limitations on Plaintiff's ability to do work-related activities (Tr. 192-93).  Dr. Nazario stated that, in his opinion, Plaintiff's condition did not appear severe enough to interfere with work-related activities (Tr. 192).

---

[5] Trochanteric bursitis results when a bursa, a fluid-filled sac that acts as a cushion or shock absorber between a tendon and a bone, becomes inflamed.  *See Steadman's Medical Dictionary*, 223, 1639-40 (William R. Hensyl et al. eds., Williams & Wilkins 25th ed. 1990) (1911).

[6] The predominant manifestations of Dysthymic Disorder are symptoms such as depressed mood for most of the day, for more days than not, as indicated either by subjective account or observation by others, for at least two years.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 380 (4th ed., American Psychiatric Ass'n 2000).

On July 30, 1999, Jane E. Cormier, Ph.D. ("Dr. Cormier"), a psychological consultant, completed a Psychiatric Review Technique of Plaintiff (Tr. 166-74). Dr. Cormier reported Plaintiff was positive for depressed mood but normal otherwise and Plaintiff's mental impairment was not severe (Tr. 167). Dr. Cormier also rated Plaintiff's functional capacities and found no restriction of activities of daily living, no difficulties in maintaining social functioning, and seldom deficiencies of concentration, persistence, or pace (Tr. 173). Additionally, Dr. Cormier reported Plaintiff had no episodes of deterioration or decompensation (Tr. 173).

On September 27, 1999, state agency medical consultant, Nidal A. Sakka, M.D. ("Dr. Sakka") administered a consultative examination of Plaintiff (Tr. 175-77). Dr. Sakka diagnosed Plaintiff with osteoarthritis in multiple joints, mainly in Plaintiff's knees and lumbar spine (Tr. 176). Dr. Sakka reported that Plaintiff's osteoarthritis did not cause any significant problems with walking or strength in the upper extremities and Plaintiff's spinal ROM had only mild limitation (Tr. 176). Additionally, Plaintiff's x-rays from the same day revealed some disc disease at L5-S1 but otherwise normal alignment of the lumbar spine (Tr. 178).

On February 25, 2000, Dr. Sakka completed a Medical Source Statement regarding Plaintiff's ability to do work-related activities (Tr. 194-97). Dr. Sakka reported Plaintiff was able to lift and/or carry and push/pull 50 pounds occasionally and 20 pounds or less more frequently (Tr. 195). Furthermore, Dr. Sakka found Plaintiff: (1) capable of standing, walking, and sitting without limitation; (2) capable of occasional climbing, balancing, kneeling; and (3) capable of frequent crouching and crawling (Tr. 195-96). Dr. Sakka found Plaintiff had no limitations concerning the manipulation of objects and no environmental

8

limitations (Tr. 197).

On October 18, 1999, Plaintiff presented to Lake City Medical Center for spine and hip x-rays (Tr. 200-01).  The x-ray of Plaintiff's spine revealed "mild convexity to the right suggesting muscle spasm but could be positional in nature"; however, the x-ray showed "no evidence of acute bone abnormality" (Tr. 200).  Plaintiff's hip x-ray showed both hips were within normal limits (Tr. 201).

On October 29, 1999, a DDS physician completed an RFC assessment of Plaintiff (Tr. 183-93).  The physician reported Plaintiff could lift 50 pounds occasionally, 25 pounds frequently and could stand for six hours in an eight hour workday (Tr. 184).  The physician's findings were based, in part, on x-rays of Plaintiff's spine (which revealed no spasm but possible disc disease) and x-rays of Plaintiff's knee (which revealed minimal degenerative changes) (Tr. 185).

On February 21, 2000, Dr. Fanney reported Plaintiff experienced tenderness in the L4-L5 area radiating down her right leg and mild tenderness in the L3 area (Tr. 202).  Dr. Fanney diagnosed Plaintiff with lumbar disc disease and hormone imbalance (Tr. 202).

On November 14, 2002, Plaintiff presented to Umesh M. Mhatre, M.D. ("Dr. Mhatre") for psychological treatment (Tr. 415).  Dr. Mhatre prescribed Plaintiff Elavil (an anti-depressant) (Tr. 415).  On January 10, 2003, Dr. Mhatre noted Plaintiff's depression was "fairly well controlled" with medication (Tr. 414).  Furthermore, on March 13, 2003, Dr. Mhatre reported Plaintiff showed "no clinical depression" and on May 9, 2003, Plaintiff's treatment response was "good" and her depression and anxiety were "under fairly good control" (Tr. 417).

On February 24, 2003, Plaintiff reported to state agency medical consultant, C. Russell Clifton, Jr., Ph.D. ("Dr. Clifton") for a Psychological Evaluation (Tr. 360-646). Dr. Clifton reported in a separate Medical Source Statement that Plaintiff had moderate to marked limitations in responding appropriately to changes in a work setting and marked limitations in her ability to interact with co-workers (Tr. 365-66). Dr. Clifton based his findings on Plaintiff's "described occasional distorted, irrational reactions to others" (Tr. 366). Dr. Clifton did not find specific functional limitations and assessed Plaintiff's GAF at 57 (Tr. 360-64).[7] Furthermore, Dr. Clifton found Plaintiff's Personality Assessment Inventory results should be assumed to be invalid, as Plaintiff attempted to portray herself in an especially negative manner (Tr. 363).[8]

On March 16, 2003, Plaintiff presented to Jean-Felert Cadet, M.D. ("Dr. Cadet") (Tr. 410-11). Dr. Cadet prescribed Lortab for Plaintiff's back pain, Elavil (an antidepressant) for Plaintiff's depression, and Xanax for Plaintiff's anxiety (Tr. 410). On April 24, 2003, Dr. Cadet reported Plaintiff's depression was stable and continued to prescribe Elavil and Xanax (Tr. 406).

---

[7] The Global Assessment of Functioning Scale (GAF) was designed by mental health clinicians to rate the psychological, social and occupational functioning of an individual on a mental health scale of 0-100. A GAF score of 41-50 describes "serious symptoms" and includes "serious impairment in the social, occupational or school functioning." A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. A GAF score of 61-70 indicates "some mild symptoms," but generally functioning "pretty well, has some meaningful interpersonal relationships." A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors with no more than slight impairment in social, occupational or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 32-34 (4th ed., American Psychiatric Ass'n 2000).

[8] A Personality Assessment Inventory is a personality test widely used to assess a person's interpersonal and emotional functioning (Tr. 363).

On March 27, 2003, Rigoberto Puente-Guzman, M.D. ("Dr. Puente-Guzman") conducted a Disability Evaluation of Plaintiff and filled out an accompanying Medical Source Statement regarding Plaintiff's ability to do work-related activities (Tr. 351-59). Dr. Puente-Guzman reported in his evaluation that Plaintiff revealed no obvious neuropathic or myelopathic abnormality (Tr. 354). One of Dr. Puente-Guzman's rehabilitative medical impressions was "vocational dysfunction" (Tr. 354); however, Dr. Puente-Guzman reported in his accompanying Medical Source Statement that Plaintiff had no exertional limitations (Tr. 356-57).

On August 6, 2003, Plaintiff presented to Dr. Mhatre and reported that she had been prescribed Effexor (an anti-depressant) (Tr. 417). Dr. Mhatre instructed Plaintiff not to take Effexor until he determined whether or not the Elavil was working (Tr. 417). On September 8, 2003, Plaintiff admitted to Dr. Mhatre that she discontinued her use of Elavil claiming she was not sure whether to take Effexor or Elavil (Tr. 417). Dr. Mhatre recorded that Plaintiff's treatment response was "poor due to noncompliance" (Tr. 416).

On August 20, 2003, Plaintiff again presented to Lake City Medical Center for x-rays of her spine (Tr. 396). The x-rays revealed only mild facet arthropathies and Plaintiff's vertebral heights, alignments, and intervertebral disc spaces appeared well maintained. Additionally, no fractures or dislocations were revealed (Tr. 396).

**B. The ALJ's Decision**

In his decision dated August 24, 2004, the ALJ found Plaintiff suffered from osteoarthritis of the knees, bursitis, and depression/dysthymia (Tr. 246). The ALJ further found Plaintiff's impairments to be severe within the meaning of the Regulations, but not severe enough to meet or medically equal any of the listed impairments in 20 C.F.R. part

11

404, subpart P, Appendix 1 (Tr. 246).  After careful consideration of the entire record, the

ALJ found Plaintiff retained the RFC for medium exertional level work on a sustained basis

with the ability to:

> lift and/or carry and push/pull 50 pounds occasionally and 25 pounds or less more frequently.  She [Plaintiff] is capable of standing, walking, and sitting without limitation.  She is capable of occasional climbing, balancing, kneeling and frequent crouching and crawling.  She can use her arms and hands for normal grasping, holding, and turning objects and she has no environmental limitations.  Mentally, she has moderate limitations concerning her ability to interact with co-workers and in responding appropriately to changes in a work setting.

(Tr. 245).

After determining Plaintiff's RFC and taking testimony from a vocational expert

("VE"), the ALJ found Plaintiff could perform her past relevant work as a certified nursing

assistant (Tr. 245-46).  *See* United States Dep't of Labor, *Dictionary of Occupational Titles*

§ 355.674-014 (4th Ed. 1991).  Based in part on the VE's testimony and after finding

Plaintiff's allegations regarding her limitations not entirely credible, the ALJ found Plaintiff

was not under a disability as defined by the Social Security Act (the "Act") (Tr. 246).

### IV. Analysis

**A. Treating Physician's Assessment**

Plaintiff claims the ALJ erred by failing to give the Medical Assessment completed

by Dr. Fanney, Plaintiff's treating physician, controlling weight and, therefore, the ALJ

incorrectly assessed Plaintiff's RFC (Doc. #21 at 7-8).  The Court, however, does not find

this argument persuasive.  The Court finds the ALJ properly discredited Dr. Fanney's

disability opinion and accurately assessed Plaintiff's RFC.

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards*, 937 F.2d at 583 (11th Cir. 1991); 20 C.F.R. § 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is consistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d at 583.

Here, Plaintiff's treating physician, Dr. Fanney, completed a Medical Assessment of Plaintiff on June 7, 1999 (Tr. 144). Dr. Fanney reported Plaintiff was unable to climb, stoop, crouch, balance, kneel, or crawl (Tr. 144). Dr. Fanney further reported Plaintiff could only stand or walk for three hours in an eight hour workday (Tr. 143). The ALJ addressed Dr. Fanney's Medical Assessment but determined it was completely inconsistent with the objective medical evidence and other evidence of record, including the Dr. Fanney's own treatment records (Tr. 242). Based on the foregoing, the ALJ did not give significant weight to Dr. Fanney's opinion that Plaintiff is disabled (Tr. 242).

In support of this determination, the ALJ noted that Dr. Fanney's treatment records regarding Plaintiff's bronchitis indicated her condition was resolved with very limited treatment (Tr. 242). The ALJ stated Dr. Fanney's treatment notes regarding Plaintiff's back pain and bursitis conflicted with his Medical Assessment of Plaintiff's limitations (Tr. 242; *see also* 205). Specifically, the ALJ pointed out that, on November 1, 1999 (five months after his assessment), Dr. Fanney reported Plaintiff's chronic back pain was better and

13

Plaintiff's bursitis was improved (Tr. 205).   Also, the ALJ mentions that, although Dr. Fanney diagnosed Plaintiff with anxiety and depression, Dr. Fanney did not identify any specific limitations resulting from these conditions (Tr. 148).

The ALJ further discredited Dr. Fanney's Medical Assessment by finding that, while Dr. Fanney diagnosed Plaintiff with trocanteric bursitis of the hip, arthritis, and degenerative disc disease (Tr. 146), the diagnostic testing did not disclose any significant abnormalities (Tr. 242; *see also* Tr. 157-58, 200-01).  Specifically, the ALJ noted that x-rays of Plaintiff's spine from August 20, 2003 revealed only mild facet arthropathies and her vertebral heights, alignments, and intervertebral disc spaces were well maintained (Tr. 424; *see also* Tr. 396).  Additionally, the ALJ noted x-rays of Plaintiff's spine, administered on September 27, 1999, showed some disc disease at L5-S1 but normal alignment of her lumbar spine (Tr. 242; *see also* Tr. 178).

In addition to Plaintiff's diagnostic testing, the ALJ cited Dr. Samera's consultative examination from November 16, 1998, which produced a finding of arthritis of the hand and knees, but not severe in nature (Tr. 121).  Dr. Samera found no evidence of wheezing or rhombic during the examination despite Plaintiff's reports of bronchitis (Tr.121).   Dr. Puente-Guzman also evaluated Plaintiff on March 27, 2003, and recorded no exertional limitations in a Medical Source Statement (Tr. 356-57).  Moreover, Plaintiff's exam revealed no obvious neuropathic or myelopathic abnormality (Tr. 354).

The ALJ also cited Dr. Sakka's assessment of Plaintiff, in which Dr. Sakka found Plaintiff was capable of medium exertional level work on a sustained basis ( Tr. 242; *see also* Tr.195-97).  Dr. Sakka reported Plaintiff could lift and/or carry and push/pull 50 pounds occasionally and 20 pounds or less more frequently (Tr. 195).  Additionally, Dr. Sakka

14

determined Plaintiff was capable of standing, walking, and sitting without limitation and capable of occasional climbing, balancing, kneeling (Tr. 195-96).  Plaintiff was also able to crouch and crawl frequently and had no limitations concerning the manipulation of objects and no environmental limitations (Tr. 195-97).

The ALJ noted Dr. Puente-Guzman found Plaintiff did not have any exertional limitations (Tr. 243; *see also* Tr. 556-58).  Although Plaintiff argues this statement by the ALJ is inaccurate (Doc. #21 at 8), the Court finds Dr. Puente-Guzman did, in fact, state Plaintiff had no exertional limitations.  Specifically, in the accompanying Medical Source Statement regarding Plaintiff's ability to do work-related activities, attached to his Disability Evaluation of Plaintiff, Dr. Puente-Guzman either checked boxes indicating Plaintiff had no limitations in the functional areas referenced or wrote the words "no limitations" above the functional areas referenced (*see* Tr. 356-59).  Accordingly, the Court finds the ALJ's statement that Dr. Puente-Guzman reported Plaintiff suffered from no exertional limitations is supported by the record even though Dr. Puente-Guzman stated Plaintiff suffered vocational dysfunction.[9]

Furthermore, two DDS physicians completed RFC reports and found Plaintiff could lift 50 pounds occasionally, 25 pounds frequently and could stand for six hours in an eight hour workday (Tr. 131, 184).  Specifically, one DDS consultant, Ms. Sanders, found Plaintiff's arthritis was not severe (Tr. 131).  Plaintiff's ROM was normal throughout and

---

[9]The Court notes that, although Dr. Puente-Guzman stated that his impression was that Plaintiff suffered vocational dysfunction, Dr. Puente-Guzman did not elaborate on this statement.  Furthermore, the Court finds Dr. Puente-Guzman's accompanying Medical Source Statement, in which he stated Plaintiff had no exertional limitations, is a more individualized and specific statement which more accurately reflects Dr. Puente-Guzman's medical opinion regarding Plaintiff's ability to perform work related activities.

Plaintiff reported no muscle weakness or numbness of her extremities (Tr. 131).  The ALJ determined Dr. Sakka's assessment and the RFC reports submitted by DDS consultants (one on January 29, 1999 and the other on October 29, 1999) to be more consistent with the objective medical evidence than Dr. Fanney's Medical Assessment (Tr. 243).

For the aforementioned reasons, the Court finds the ALJ properly discounted Dr. Fanney's Medical Assessment by finding it was not consistent with the objective medical evidence of record, Dr. Fanney's own treatment records, or the opinions of the consultative examiners.  Additionally, the Court finds the ALJ's determination in this regard is supported by substantial evidence of record as outlined above.

## B. Pain Standard[10]

Plaintiff also argues the ALJ erred by determining Plaintiff's testimony was not entirely credible (Doc. #1 at 1).  The Court, however, is not persuaded by this argument. The Court finds the ALJ properly discounted Plaintiff's complaints of disabling pain by articulating several reasons for finding Plaintiff's subjective complaints not entirely credible. In addition, the undersigned finds the reasons articulated by the ALJ for discrediting Plaintiff's subjective complaints of pain are supported by substantial evidence of record.

When a plaintiff's credibility is at issue and the Commissioner rejects a plaintiff's allegations of pain, "[the ALJ] must articulate explicit and adequate reasons" for doing so. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).  In *Johns v. Bowen*, 821 F.2d 551, 557 (11th Cir. 1987), the Court stated that, when a claimant's testimony is critical, the ALJ

---

[10]   The Court notes that the remaining issues discussed herein were raised by Plaintiff in her complaint (*see* Doc. #1 at 1); however, these issues were not addressed by Plaintiff in her memorandum of law in support of her complaint (*see* Docs. #1, #21).

must articulate adequate reasons for questioning the claimant's credibility.   *Allen v. Sullivan*, 880 F.2d 1200, 1202-03 (11th Cir. 1989); *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *Walker v. Bowen*, 826 F.2d 996, 1004 (11th Cir. 1987).   Furthermore, the reasons given for discrediting a plaintiff's pain testimony must be based on substantial evidence.   *Jones v. DHHS*, 941 F.2d 1529, 1532 (11th Cir. 1991).

In the instant case, the ALJ determined Plaintiff's statements concerning her impairments and their impact on her ability to work were not entirely credible in light of the medical history, the reports of treating and examining practitioners, the degree of medical treatment required, and Plaintiff's own description of her activities and lifestyle (Tr. 241).

In reference to Plaintiff's medical history, the ALJ noted that Plaintiff claimed she had to lie down periodically in order to relieve her back and leg pain; however, the treatment records do not indicate that a treating source advised her to do so (Tr. 242).   Additionally, Plaintiff did not tell treating physicians that her symptoms required her to lie down periodically throughout the day and the medical history did not reveal this form of treatment was medically necessary (Tr. 242).

The ALJ also found Plaintiff's own description of her activities and lifestyle were not consistent with her allegations of pain (Tr. 241).   Specifically, the ALJ noted that Plaintiff reported she could take care of her own needs and do household maintenance activities, such as cooking, washing dishes, laundry, shopping, and other household chores (Tr. 139, 363).   Plaintiff also testified that she had a valid driver's license which she planned to renew (Tr. 257).   In addition, the ALJ noted that Plaintiff maintained regular social contact, as her mother visited often and she lived with her son and disabled daughter (Tr. 273-77).

17

In this case, the Court finds the ALJ clearly articulated at least three reasons to support his credibility finding and the Court finds the reasons articulated by the ALJ for discounting Plaintiff's statements regarding the disabling nature of her pain are supported by substantial evidence.  If an ALJ gives at least three reasons for discrediting a plaintiff's subjective complaints of pain, a court may find the ALJ properly discredited the subjective pain testimony.  *See Allen*, 880 F.2d at 1203.

## C. Plaintiff's Mental Impairment

Plaintiff argues the ALJ did not properly evaluate her mental impairment alone, or in combination with her physical impairments (Doc. #1 at 1).  The undersigned, however, finds Plaintiff's argument unpersuasive for the following reasons.

To evaluate a claim of disability based on a mental impairment, the Commissioner is required to follow the procedures set forth in 20 C.F.R. § 416.920a.  Under those procedures, the ALJ must make separate evaluations on a four-point scale regarding how the claimant's mental impairment impacts four functional areas: "activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  The ALJ's evaluations must be incorporated into his or her findings and conclusions.  *Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005).

Here, the ALJ found Plaintiff had "mild restriction of activities of daily living," "mild to moderate difficulties in maintaining social functioning," and "mild to moderate difficulties in maintaining concentration, persistence, or pace" (Tr. 245).  The ALJ further stated Plaintiff had "not experienced repeated episodes of decompensation, each of extended duration" (Tr. 245).

18

In addition to reviewing Plaintiff's functional capacities, the ALJ evaluated the evidence of record and determined Plaintiff was not disabled as a result of her mental impairment alone, or in combination with her physical impairments (Tr. 246). The ALJ reasoned that Plaintiff lacked an ongoing history of treatment and, when Plaintiff was treated, she failed to comply with prescribed medical treatment (Tr. 243). Additionally, the ALJ noted that DDS psychologists did not find Plaintiff's mental impairment to be severe or that it imposed significant work-related limitations (Tr. 244).

The record shows that Dr. Mhatre treated Plaintiff for depression and prescribed her Elavil (Tr. 414). Dr. Mhatre noted in his treatment records from January 10, 2003, that Plaintiff's depression was "fairly well controlled" with medication (Tr. 414). Furthermore, Dr. Mhatre reported on March 13, 2003, that Plaintiff showed "no clinical depression" and on May 9, 2003, Plaintiff's treatment response was "good" and her depression and anxiety were "under fairly good control" (Tr. 417).

On August 6, 2003, Plaintiff informed Dr. Mhatre that she had been prescribed Effexor by another doctor (Tr. 417). Dr. Mhatre instructed Plaintiff not to take Effexor until he determined whether or not Elavil was working (Tr. 417). On September 8, 2003, Plaintiff admitted to Dr. Mhatre that she discontinued her use of Elavil claiming she was not sure whether to take Effexor or Elavil (Tr. 417). Dr. Mhatre recorded that Plaintiff's treatment response was "poor due to noncompliance" (Tr. 416).

The ALJ further found Plaintiff's mental impairment was not disabling because Plaintiff lacked an ongoing history of treatment (Tr. 243). Prior to 2002, Plaintiff did not have any mental complaints serious enough for her to seek treatment with a psychiatric or mental health professional (*see e.g.*, Tr. 146). Furthermore, Dr. Fanney did not refer

19

Plaintiff for further treatment after diagnosing her with anxiety and depression (Tr. 243). In addition to records from Plaintiff's treating physicians, the ALJ noted that state agency medical consultants did not find Plaintiff's mental impairment restricted her from work-related activities (*see* Tr. 244).

For instance, Dr. Clifton performed a consultative Psychological Evaluation and completed a Medical Source Statement on February 24, 2003 (Tr. 360-66). Although the ALJ accepted certain aspects of Dr. Clifton's assessment, he did not give it controlling weight because the ALJ found Dr. Clifton's evaluation and Medical Source Statement were inconsistent (Tr. 244). Specifically, in his Medical Source Statement, Dr. Clifton found Plaintiff had moderate to marked limitations in responding appropriately to changes in work setting and marked limitations in her ability to interact with co-workers (Tr. 366). Dr. Clifton based his findings on Plaintiff's "described occasional distorted, irrational reactions to others" (Tr. 366). The ALJ noted that, although Dr. Clifton reported the aforementioned limitations in his Medical Source Statement, he did not find specific functional limitations in his narrative report and he assessed Plaintiff's GAF at 57 (which indicates only a moderate level of functional limitation) (Tr. 360-64).[11]

The ALJ found the earlier consultative examination performed by Dr. Nazario on July 21, 1999 to be more consistent with the overall evidence of record (Tr. 244).[12] Dr. Nazario reported that Plaintiff appeared somewhat depressed but her emotional difficulty did not

---

[11] A GAF score of 51-60 describes "moderate symptoms" and includes only moderate difficulty in functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, DSM-IV, 380 (4th ed., American Psychiatric Ass'n 2000).

[12] The Court notes that the ALJ stated Dr. Nazario's evaluation occurred on May 6, 1998; however, the evaluation actually occurred on July 21, 1999 (Tr. 138).

appear severe enough to preclude employment (Tr. 140).  Furthermore, on February 14, 2000, Dr. Nazario filled out a Medical Source Statement and did not identify any specific limitations on Plaintiff's functional abilities (Tr. 192-93).  In addition, Dr. Cormier completed a Psychiatric Review Technique of Plaintiff, reporting that Plaintiff exhibited a depressed mood, which, in his opinion, was not severe and did not impose any significant work-related limitations (*see* Tr. 166-74).

Based on the foregoing, the Court finds the ALJ properly reviewed the medical evidence of record when he determined Plaintiff's mental impairment, alone or in combination with Plaintiff's physical impairments, was not disabling.

## D. Accounting for Plaintiff's Age

Lastly, Plaintiff asserts the ALJ erred by failing to consider her age at the time of the hearing (Doc. #1 at 1).  The Court does not find this argument persuasive.  Pursuant to C.F.R. § 416.960(b)(3), if the ALJ determines a plaintiff can perform his or her past relevant work, the ALJ "will not consider [the] vocational factors of age, education, and work experience[.]"  In the instant case, the ALJ found Plaintiff could perform her past relevant work as a certified nursing assistant.  Therefore, the ALJ did not err by not addressing Plaintiff's age.

## V. Conclusion

Upon due consideration, the Court finds the decision of the Commissioner was decided according to proper legal standards and is supported by substantial evidence.  As neither reversal nor remand is warranted in this case, and for the aforementioned reasons, the decision of the ALJ is hereby **AFFIRMED** pursuant to sentence four of 42 U.S.C. §

405(g).  The Clerk of the Court is directed to enter judgment consistent with this ruling and, thereafter, to close the file.  Each party shall bear its own fees and costs.

**DONE AND ORDERED** at Jacksonville, Florida this  12th  day of August, 2008.


Copies to all counsel of record
        and *pro se* parties, if any

**THOMAS E. MORRIS**
United States Magistrate Judge